JUDGE PRESKA

James A. Prestiano, Esq. (JP-6699)
THE LAW OFFICES OF
JAMES A. PRESTIANO, P.C.
631 Commack Road, Suite 2A
Commack, New York 11725
Tel. No. (631) 499-6000
Fax. No. (631) 499-6001
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK



08 CV 00899

RECEIVED
JAN 2 5 2008
U.S.D.C. S.D. N.Y.

O 8 cv 00899
(L A P) (A J P)
E C F   C A S E

---

PINEWOOD TRADING CO, L.P., individually,
JAMES G. BALODIMAS, individually, and
PINEWOOD TRADING CO, L.P. and
JAMES G. BALODIMAS, derivatively as
Members of TOUGHLOVE AMERICA, LLC,

                                              Plaintiffs,

        -against-

TOUGHLOVE AMERICA, LLC, AMERICAN
FAMILY HEALTH SERVICES GROUP, LLC,
SPIEGEL & JONES, LLP, SPIEGEL &
ASSOCIATES, LLC, RONY ZODKEVITCH,
IGAL FEIBUSH AND STEVEN SPIEGEL,

                                              Defendants.

COMPLAINT

---

        PINEWOOD TRADING CO, L.P., individually, JAMES G. BALODIMAS, individually,

and PINEWOOD TRADING CO, L.P. and JAMES G. BALODIMAS derivatively as members

of TOUGHLOVE AMERICA , LLC (collectively referred to herein as the "plaintiffs") by and

through their attorneys The Law Offices of James A. Prestiano, P.C. with offices located at 631

Commack Road, Suite 2A, Commack, New York 11725 hereby allege, upon information and

belief, for their Complaint against the defendants as follows:

## PRELIMINARY STATEMENT

1.    This is an action for damages based upon a direct claim of securities fraud in connection with the sale of membership interests in a Nevada limited liability company pursuant to Section 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Rule 10b-5 promulgated thereunder. This action also includes direct claims for conspiracy, common law fraud, breach of fiduciary duty and breach of contract, and derivative claims for mismanagement, waste, breach of fiduciary duty, negligence and legal malpractice.

2.    Defendants, individually and in concert, fraudulently induced the plaintiffs to invest $675,000 in Toughlove America, LLC ("TLA") in exchange for membership interests in TLA representing 5% of the outstanding equity of TLA based on material misrepresentations and omissions.

3.    The defendants' material misrepresentations and omissions were contained in, among other things, a private placement memorandum, dated November 11, 2005, which was prepared and marketed by the defendants (the "PPM") and relied upon by plaintiffs in investing $675,000 in TLA.

4.    At the time of the plaintiffs' investment in TLA, American Family Health Services Group, LLC ("AFHS") was the manager of TLA and AFHS was owned and controlled by Rony Zodkevitch ("Zodkevitch"), Igal Feibush ("Feibush") and Steven Spiegel ("Spiegel").

5.    The PPM, among other things, materially misrepresented or omitted to disclose to plaintiffs: (a) the background and credentials of Zodkevitch, Feibush and Spiegel; (b) certain diputes and conflicts between Zodkevitch, Feibush and Spiegel; (c) the debts and obligations of TLA; (d) the status of TLA's license to use the intellectual property relating to the

TOUGHLOVE® program; (e) the collapsing of the structure of TLA's license to use the intellectual property relating to the TOUGHLOVE® program; (f) the use of proceeds of the offering under the PPM and (g) the business prospects and projected revenues of TLA.

6.    Defendants' made numerous representations to plaintiffs concerning TLA and the securities of TLA that were materially false and misleading. Additionally, the defendants omitted to disclose material facts to the plaintiffs.

7.    In reliance of the defendants' fraudulent representations, in or about January 2006, the plaintiffs' invested an aggregate amount of $675,000 in TLA in exchange for membership interests in TLA representing 5% of the outstanding equity of TLA. The plaintiffs relied upon the statements and representations of the defendants in deciding to purchase the membership interests in TLA.

8.    The defendants acted in furtherance of an agreement to obtain a common purpose – to wit: the funding of TLA (the "Conspiracy"); and that each defendant did jointly and severally commit acts to fraudulently induce plaintiffs to invest $675,000 to TLA in exchange for membership interests in TLA – to wit: by making misrepresentations and omissions of material facts.

9.    The representations made by the defendants concerning TLA, in furtherance of their Conspiracy, induced the plaintiffs to invest $675,000 in TLA.

10.    Shortly after plaintiffs' investment in TLA, but before the plaintiffs' investment was released from escrow under the PPM, a dispute arose among Zodkevitch, Feibush and Spiegel.

11.    Defendants were obligated to inform plaintiffs of the internal dispute that arose among the individual principals of TLA, which constituted a material change of circumstances, before the defendants' released plaintiffs' money from the escrow established under the PPM.

12.    Defendants omitted to disclose material information to plaintiffs to wit - the dispute among the principals of TLA, at the time the plaintiffs' money was released from escrow.

13.    The defendants, in furtherance of their Conspiracy, knowingly and with the intent to deceive the plaintiffs made material misrepresentations and omissions concerning TLA to induce plaintiffs to invest in TLA.

14.    Upon information and belief each of the defendants benefited and/or profited by the plaintiffs' investment in TLA.

15.    As a direct and proximate result of each of the defendants' material misrepresentations and omissions the plaintiffs were damaged.

16.    Following the release of plaintiffs' money from escrow the dispute among the principals of TLA escalated and Zodkevitch, Feibush and Spiegel each violated their fiduciary duties owed to plaintiffs by taking action for their own interests to the detriment of the plaintiffs.

17.    Based on the improper conduct of the defendants, TLA lost its license to use and exploit the intellectual property relating to the TOUGHLOVE® program and the business of TLA came to a halt.

18.    As a result of the dispute among Zodkevitch, Feibush and Spiegel, which was not disclosed to plaintiffs, the business of TLA was destroyed and plaintiffs were damaged.

19.    Plaintiffs also asset derivative claims against certain defendants for mismanagement, waste, breach of fiduciary duty, negligence and legal malpractice.

4

20.    Plaintiffs have not made a pre-suit demand on TLA because such an act would be futile. As set forth in further detail below, Zodkevitch, Feibush and Spiegel, the individual managers of TLA, are entrenched in a civil action among themselves to protect their individual interests to the detriment of TLA. In addition, Zodkevitch, Feibush and Spiegel, the individual managers of TLA are currently deadlocked; are marred with conflicts of interest, and are all named defendants in this action based on their individual conduct. Accordingly, any demand to assert the derivative claims asserted herein would be futile.

21.    Zodkevitch, Feibush and Spiegel, as managers and control persons of TLA, owed fiduciary duties to TLA and the plaintiffs, Zodkevitch, Feibush and Spiegel each breached their fiduciary duties owed TLA and the plaintiffs.

22.    AFHS, Zodkevitch, Feibush and Spiegel committed mismanagement and waste in the operation and management of TLA between January, 2006 and the present, which caused TLA to suffer significant losses and ultimately to cease operations.

23.    At all relevant times TLA and AFHS received legal advice and counsel from Spiegel, Spiegel & Jones, LLP ("S&J LLP") and/or Spiegel & Associates, LLC ("S&A LLC").

24.    Upon information and belief S&J LLP, S&A LLC and Spiegel (collectively the "Attorney Defendants") violated their duties owed to TLA and committed negligence and legal malpractice by, among other things, assisting the owner of the TOUGHLOVE® intellectual property to terminate TLA's license to use the TOUGHLOVE® intellectual property.

25.    Additionally, the Attorney Defendants committed legal malpractice by failing to disclose material information to the plaintiffs regarding TLA, such as the dispute between Zodkevitch, Feibush and Spiegel.

26.    The Attorney Defendants also committed negligence and legal malpractice by releasing plaintiffs' $675,000 investment in TLA from escrow without disclosing the material change of circumstances to the plaintiffs; to wit: the dispute between Zodkevitch, Feibush and Spiegel.

27.    As a direct and proximate result of each of the defendants' wrongful conduct alleged herein the plaintiffs were damaged.

28.    Plaintiffs commenced this action to recover its losses in an amount to be determined at trial, but at least $675,000 sustained directly as a result of defendants' wrongful conduct.

29.    Plaintiffs respectfully request a judgment holding defendants, jointly and severally, liable for the damages suffered by plaintiffs in an amount to be determined at the trial of this matter, but at least $675,000, plus interest, the costs and expenses of this action, including legal fees, punitive damages and for such other and further relief as the court deems appropriate.

## THE PARTIES

30.    Pinewood Trading Fund, LP ("Pinewood"), is a limited partnership organized under the laws of the State of Texas with offices located at 1029 East Drive, Beaumont, Texas 77706.  Pinewood is a member of TLA and owns at least a 1% membership interest in TLA.  Jeb Brooks ("Brooks") is the manager of the general partner of Pinewood.  Brooks resides in New York, New York.

31.    James G. Balodimas ("Balodimas"), is an individual who resides in New York, New York.  Balodimas is a member of TLA and owns at least a 4% membership interest in TLA.

32.    Toughlove America, LLC ("TLA"), is a limited liability company organized and existing under the laws of the State of Nevada with offices located at 148 North Main Street, Florida, New York 10921.  Upon information and belief TLA maintained and operated a bank account at a branch of North Fork Bank located at 32nd Street and Park Avenue, New York, New York.  Upon information and belief TLA was formed by defendants on or about March 30, 2005.

33.    American Family Health Services Group, LLC ("AFHS") is a limited liability company organized and existing under the laws of the State of Nevada with offices located at 148 North Main Street, Florida, New York 10921.  Upon information and belief AFHS was formed by defendants on or about June 12, 2002.  AFHS is the manager of TLA.

34.    Spiegel & Jones, LLP ("S&J LLP") is a limited liability partnership engaged in the practice of law organized and existing under the laws of the State of New York with offices located at 148 North Main Street, Florida, New York 10921.  Upon information and belief at all relevant times S&J LLP provided legal services to TLA and AFHS.

35.    Spiegel & Associates, LLC ("S&A LLC") is a limited liability company engaged in the practice of law organized and existing under the laws of the State of New York with offices located at 148 North Main Street, Florida, New York 10921. Upon information and belief at all relevant times S&A LLC provided legal services to TLA and AFHS.

36.    Rony Zodkevitch ("Zodkevitch") is an individual who upon information and belief resides in Los Angeles, California.  Upon information and belief Zodekvitch is a member and 65% owner of AFHS and a control person of TLA.

7

37. Igal Feibush ("Feibush") is an individual who upon information and belief resides in Hermosa Beach, California. Upon information and belief Feibush is a member and 30% owner of AFHS and a control person of TLA.

38. Steven Spiegel ("Spiegel") is an individual who upon information and relief resides at 148 North Main Street, Florida, New York 10921. Upon information and belief Spiegel is a member and 5% owner of AFHS and a control person of TLA. Upon information and belief, Spiegel is licensed to practice law in the State of New York and Spiegel was and/or is a principal of S&J LLP and S&A LLC. Upon information and belief at all relevant times Spiegel provided legal services to TLA and AFHS.

39. Zodkevitch, Feibush and Spiegel are collectively referred to herein as the "Individual Defendants."

40. Spiegel, S&J LLP and S&A LLC are collectively referred to herein as the "Attorney Defendants."


**JURISDICTION**

41. The Court has federal question jurisdiction over this matter under 28 U.S.C. Section 1331 pursuant to 15 U.S.C. Section 78j(b), 15 U.S.C. Section 77v(a) and 15 U.S.C. Section 78aa. This Court also has ancillary jurisdiction over all other claims asserted herein pursuant to 28 U.S.C. Section 1367.

42. Venue lies in this district under the provisions of 15 U.S.C. Section 77v(a) and 28 U.S.C. Section 1391, because among other things a substantial part of events, representations and omissions giving rise to the claims occurred in this District.

8

43.    In connection with the acts, conduct, and combinations alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, and telephone communications.

## STATUTE OF LIMITATIONS

44.    Pinewood made its investment in TLA in or about January, 2006.

45.    Balodimas made his investment in TLA in or about January, 2006.

46.    Plaintiffs commenced this action for a direct claim of securities fraud against defendants in connection with the sale of membership interests in TLA based on violations of Section 10(b) of the Exchange Act within two years of the date the plaintiffs invested in TLA.

47.    The applicable statute of limitations for plaintiffs' federal securities law claims is the earlier of: (a) 2 years after the discovery of the facts constituting the violation; or (b) 5 years after such violation. *See* 28 U.S.C. § 1658 (b).

48.    Accordingly, plaintiffs' claims for securities fraud have been filed within the time period prescribed by the applicable statutes of limitation.

## REASONS WHY DEMAND ON TLA WAS NOT MADE TO ASSERT PLAITNIFFS' DERIVATIVE CLAIMS AGAINST DEFENDANTS

49.    Plaintiffs did not make a demand on TLA to commence an action against the Attorney Defendants for the derivative claims asseted herein, including, among other things, claims for mismanagement, waste, breach of fiduciary duty, negligence and legal malpractice, because such demand would have been futile.

50.     We note that under Nevada law a member of a limited liability company is permitted to bring a derivative action where such member's effort to cause its manager to bring the action "*is not likely to succeed*." *See* Nevada Revised Statutes Section 86.483.

51.     Accordingly, plaintiffs' obligation to make a demand on TLA to assert plaintiffs' derivative claims against the defendants is excused because it is not likely that plaintiffs would succeed in their efforts in causing Zodkevitch, Fiebush and Spiegel to commence an action on the defendants asseting plaintiffs' derivative claims.

52.     Zodkevitch, Fiebush and Spiegel are presently involved in a lawsuit alleging claims of, among other things, breach of fiduciary duty and legal malpractice pending in New York State, Supreme Court, New York County (the "State Action"). The State Action only involves claims by Zodkevitch, in his individual capacity, against Feibush and Spiegel in their individual capacities, for, among other things, breach of fiduciary duty, misrepresentation and legal malpractice. In connection with the State Action, Zodkevitch sought and obtained a preliminary injunction against Feibush and Spiegel that effectively halted the business of TLA.

53.     In July 2006, in connection with the State Action, Spiegel interposed a third party complaint against AFHS and TLA to recover legal fees allegedly due to Spiegel. It is important to note neither Zodkevitch nor Feibush on behalf of AFHS or TLA, has interposed an answer to Spiegel's third party complaint.

54.     It is submitted that since Zodkevitch, Fiebush and Spiegel, the individual managers of TLA, are currently embroiled in the State Action, any request by plaintiffs to have TLA commence an action against each of the Individual Defendants for mismanagement, waste, breach of fiduciary duty, negligence and legal malpractice, would have been futile.

10

55.    Zodkevitch, Fiebush and Spiegel, the individual managers of TLA, are all defendants in the action at bar and the allegations contained herein demonstrate that the Individual Defendants are entrenched and marred with conflicts of interests. Accordlingly, any demand on TLA to commence an action against Zodkevitch, Feibush, Spiegel and the Attorney Defendants would have been futile and thus any pre-suit demand requirement is excused.

## STATEMENT OF FACTS

56.    TLA was formed by the defendants to be vehicle though which Zodkevitch, Feibush and Spiegel were going to exploit for profit the parenting skills, particularly for families of teens in crisis, that were developed through the TOUGHLOVE® program which was developed by David and Phyllis York (the "Yorks").

57.    TOUGHLOVE® was a not-for-profit self help program focusing on the areas of destructive adolescent behavior and the families of children in crisis that was developed by the Yorks in the 1980s. In or about 1982 the TOUGHLOVE® program was the subject of a book written by the Yorks entitled: TOUGHLOVE which was subsequently made into an ABC made for television movie.

58.    Zodkevitch allegedly became affiliated with the non-profit TOUGHLOVE® program in the early 1990s.

59.    Upon information and belief, in or about 2001, Zodkevitch, with the consent of the Yorks, determined to convert the TOUGHLOVE® program into a for profit enterprise. The primary asset of the TOUGHLOVE® program was the intellectual property and trademarks owned by the Yorks relating to the non-profit TOUGHLOVE® program (the "TOUGHLOVE®

11

IP").

60.    Upon information and belief, in or about 2001, Zodkevitch engaged the assistance of Feibush and Spiegel to exploit for profit the TOUGHLOVE® IP.

61.    In or about December 2001, the Yorks licensed (the "Rony Z License") the TOUGHLOVE® IP to Rony Z, LLC, an entity controlled by Zodkevitch. The Rony Z License is incorporated herein by reference.

62.    Thereafter, in or about April 2002, Rony Z, LLC licensed the TOUGHLOVE® IP as included in the Rony Z License to AFHS (the "AFHS License"). Upon information and belief the AFHS License was amended on one or more occasions following April 2002. The AFHS License is incorporated herein by reference.

63.    As of March 30, 2005, AFHS was owned as follows: 65% by Zodkevitch, 30% by Feibush and 5% by Spiegel.

64.    During all relevant times alleged herein, Zodkevitch, Fiebush and Spiegel were the beneficial owners of TLA and/or have a beneficial interest in TLA.

65.    During all relevant times alleged herein, Zodkevitch, Fiebush and Spiegel were control persons of TLA.

66.    By reason of their position as control persons of TLA and because of their ability to control the business and corporate affairs of TLA, the Individual Defendants owed to TLA and its members the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage TLA in a fair, just, honest, and equitable manner.

67.    The Individual Defendants were and are required to act in furtherance of the best interests of TLA and its members so as to benefit all members equally and not in furtherance of their personal interest or benefit. Zodkevitch, Feibush, Spiegel each owes to TLA and its members the fiduciary duty to exercise good faith and diligence in the administration of the affairs of TLA and in complying with the representations contained in the PPM.

68.    The Individual Defendants, because of their positions as control persons of TLA, were able and did, directly or indirectly, exercise control over the wrongful acts set out in this complaint.

69.    To discharge their duties, Zodkevitch, Feibush, Spiegel were each required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of TLA. By virtue of these duties, the Individual Defendants were required to, among other things:

a.    Ensure that the affairs of TLA were conducted in an efficient, businesslike manner in accordance with the disclosures contained in the PPM;

b.    Ensure that TLA utilized the proceeds of the PPM offering in accordance with the terms of the PPM;

c.    Exercise good faith in supervising the preparation of financial information concerning TLA and establishing accounting controls to ensure the preparation of accurate financial statements; and

d.    Exercise good faith or reasonable diligence in disclosing to the plaintiffs material information concering TLA, such as: (i) the dispute between Zodkevitch, Feibush and Spiegel, (ii) the inability to collapse the structure of the TLA License,

(iii) the loss of the TLA License and/or (iv) the status or effect of the State Action.

70.    The Individual Defendants breached their duties of loyalty and good faith owned to TLA and the plaintiffs by, among other things:

      a.    failing to disclose the dispute among Zodkevitch, Fiebush and Spiegel;

      b.    prosecuting the State Action to the detriment of TLA after taking the plaintiffs' money in the PPM Offering;

      c.    failing to have the basic systems in place to account for and protect the assets of TLA;

      d.    causing or allowing TLA to conduct its business in a wasteful and imprudent manner; and

      e.    causing the business of TLA to be destroyed.

71.    Upon information and belief, as of March 30, 2005, the Attorney Defendants provided legal advice and legal counsel to AFHS.

72.    Upon information and belief, in or about March 2005, Zodkevitch, Feibush and Spiegel based on the legal advice of the Attorney Defendants determined to form TLA to be the vehicle to exploit for profit the TOUGHLOVE® IP.

73.    Upon information and belief, the Individual Defendants formed TLA to raise money from investors for TLA so that TLA could exploit for profit the TOUGHLOVE® IP.

74.    Upon information and belief, in or about May 2005, AFHS licensed a portion of the TOUGHLOVE® IP licensed to AFHS under the AFHS License to TLA (the "TLA License"). The TLA License is incorporated herein by reference. Upon information and belief the TLA License was terminated in or about March 2006.

14

75.    The Individual Defendants, with the assistance of the Attorney Defendants, drafted and marketed the Confidential Private Placement Memorandum for TOUGHLOVE® America, LLC, dated November 11, 2005 (the "PPM") in connection with a $4,000,000 offering of the securities of TLA (the "PPM Offering"). The PPM is incorporated herein by reference.

76.    In January 2006, prior to plaintiffs' investment of $675,000 in TLA, the defendants made misrepresentations of material facts to plaintiffs through oral and written communications, separate and apart from the PPM. In this regard we note that plaintiffs had numerous communications with each of the Individual Defendants, either verbal or by e-mail, concerning the defendants' solicitation of plaintiffs' investment in TLA. The Individual Defendants in furtherance of their conspiracy made, among others, the following misrepresentations:

    a.    that Zodkevitch had the credentials and qualifications to manage TLA and be the face of TLA;

    b.    that Feibush had the credentials and qualifications to manage TLA;

    c.    that TLA had accounting controls or that TLA had engaged accountants;

    d.    that TLA had raised more that $1,000,000 under the PPM, not including plaintiffs' investment.

    e.    the business prospects of TLA and the financial projections of TLA;

    f.    the relationship among Zodkevitch, Fiebush and Spiegel, including their dispute over the ownership of AFHS and other conflicts of interest;

    g.    that the license structure relating to the TOUGHLOVE® IP would be collapsed, so that TLA would be the direct holder of the license for the

15

TOUGHLOVE® IP; and

    h.    the use of the proceeds raised in the PPM Offering.

77.    In January 2006, prior to plaintiffs' investment of $675,000 in TLA, the defendants, in furtherance of the their conspiracy, omitted to disclose to the plaintiffs that:

    a.    the internal dispute among the Individual Defendants;

    b.    the lack of management experience of the Individual Defendants;

    c.    the lack of any accounting controls for TLA;

    d.    the true nature of the debt and liabilities of TLA, including but not limited to TLA's indebtedness to Spiegel and the Attorney Defendants.

    e.    the true use of proceeds from the TLA offering; and

    f.    Zodkevitch's alternative lifestyle.

78.    In or about Janaury 2006, Brooks met with Zodkevitch in Los Angeles, California, and Zodkevitch misled Brooks misrepresenting the facts set forth in paragraph 76, above and omitting to disclose the information set forth in paragraph 77, above.

79.    Spiegel and Feibush also made misrepresentations to Brooks in emails, dated January 9, 2006 (money raised under PPM), January 11, 2006 (Zodkevitch's credentials), January 13, 2006, (collapsing the license structure relating to the TOUGHLOVE® IP), January 16, 2006 (size of offering), January 17, 2006 (TLA business and TLA management).

80.    In reliance on the representations contained in the PPM and the other written and oral representations made by Zodkevitch, Feibush and Spiegel to plaintiffs, in furtherance of their conspiracy, to fraudulently induce persons to invest in TLA, the plaintiffs invested an aggregate amount of $675,000 in TLA in or about January, 2006 (the "Investment Date").

16

81.    The cover page to the PPM states that:

Uses of Offering:

TOUGHLOVE® promotes parenting skills, particularly for families of teens in crisis, and is a recognized brand name in the large, but fragmented, market for teen behavioral services.    This Offering represents the first major expansion in 25 years of the TOUGHLOVE® organization and membership. Formerly operated as a not-for-profit, TOUGHLOVE® is now a business under the direction of its past president, a triple board-certified psychiatrist (M.D.). ***The proceeds of this Offering will fund the strategic business and cash flow plan as described in detail in this Memorandum, including:***

• ***Production of media materials (e.g., books, workbooks, infomercials), for membership and mass market***

• ***Support for growth of membership base, including training of TOUGHLOVE® group leaders***

• ***Marketing and public relations for education support, membership services and media sales.***

*See* PPM at Cover Page (emphasis supplied).

82.    We submit the representations highlighted in the prior paragraph and contained in the PPM are false and misleading. Upon information and belief almost none of the proceeds of the PPM Offering were used for (a) Production of media materials (e.g., books, workbooks, infomercials), for membership and mass market; (b) Support for growth of membership base, including training of TOUGHLOVE® group Leaders; and/or (c) Marketing and public relations for education support, membership services and media sales.

83.    Upon information and belief much of the money raised in the PPM Offering was distributed directly to the Feibush and Spiegel and their designees.

17

84.    Attached hereto as Exhibit A is a schedule prepared by Zodkevitch's counsel in connection with the State Action, which sets forth the expenditures by TLA of the proceeds raised in the PPM Offering. Exhibit A reveals that in the five months following the Investment Date approximately $180,000 was paid directly to Feibush and Spiegel. The information contained in Exhibit A is incorporated herein. We submit that TLA's obligations to make those expenditures were not disclosed to the plaintiffs.

85.    The PPM states, further, that:

> Although no assurances can be given, the Company's goal and belief is to achieve membership and media sales of $234 Million annually by calendar year 2009, with accumulated net retained earnings (prior to distribution) through 2009 in excess of $235 Million (see Exhibit "A" to this Memorandum).

*See* PPM at p. 2.

86.    The defendants' projection of $235,000,000 in retained earnings for TLA as of December 31, 2009 was false and misleading.

87.    The PPM states that:

> The constituent members of AFHS, who also founded the Company, are:
>
> • **Dr. Zodkevitch, whose private psychiatric practice caters to the Hollywood elite** and who also serves as a consultant to the Screen Actors Guild;
>
> • Igal J. Feibush, co-founder of CitiHabitats Real Estate, once nominated by Crain's New York as one of the top 40 entrepreneurs under 40; and
>
> • Steven J. Spiegel, Esq., an Ivy League attorney once profiled by Apple Computer as "Taking 'Think Different' to a whole new level."

18

> *The Company is also supported and well-advised by persons*
> *renowned in the fields of finance, media, behavioral medicine,*
> *membership organization, and social entrepreneurship,* as well
> as by TOUGHLOVE founders David and Phyllis York.

*See* PPM at p. 2 (emphasis supplied).

88.     The above statement contained in the PPM is false and misleading

because, among other things, upon information and belief Zodkevitch's private

psychiatric practice does not cater to the Hollywood elite and TLA was not "supported

and well-advised by persons renowned in the fields of finance, media, behavioral

medicine, membership organization, and social entrepreneurship."

89.     With respect to Zodkevitch the PPM states, further, that:

> *Ron Zodkevitch, M.D., a co-founder of the Company, and the*
> *Company's Chairman and Program Director, is one of the most*
> *respected and experienced practitioners and academicians in the*
> *field of psychiatry.* His board certifications include
> Child/Adolescent Psychiatry, Adult Psychiatry, and Addiction
> Medicine, a distinction held by less than one hundred fifty
> physicians in this country. Known for his work with families in the
> area of child/adolescent psychiatry and parenting, *he is positioned*
> *to become a compelling media figure, like the self-help*
> *celebrities Dr. Phil, Tony Robbins, and Dr. Laura.* He has been
> featured as an expert on numerous television shows, and *was the*
> *founding co-host of the syndicated radio show "LOVELINE®."*
> He is a graduate of Johns Hopkins University, the University of
> Miami School of Medicine, and the Hospital Administration
> program at the University of California, Long Beach.

*See* PPM at p. 50 (emphasis supplied).

91.     The above statement contained in the PPM is false and misleading

because, among other things, Zodkevitch's is not comparable to self-help celebrities like

Dr. Phil, Tony Robbins, and Dr. Laura because of, among other things, his qualifications

and his alternative lifestyle. Additonally, upon information and belief, Zodkevitch was

not the founding co-host of the syndicated radio show "LOVELINE®."

92. The PPM goes on to provide that:

Ron Zodkevitch, M.D. (affectionately known by his patients and radio listeners as "Dr. Zod") is one of the most well-known and respected physicians in Southern California. Based in Beverly Hills, he is one of only 150 psychiatrists in America that are certified by three major boards. In 1993, Dr. Zodkevitch was the Chief of Staff at Los Altos Medical Center in California when he consulted with its parent company, National Medical Enterprise (Tenet Healthcare), one of the largest for-profit hospital chains. His assignment was to arrange a licensing deal with the Yorks for the TOUGHLOVE® Program. The Yorks saw in Dr. Zod something they had not seen in any of the thousands of clinicians, or hundreds of thousands of individuals, who they had met previously. The Yorks saw Dr. Zod as someone with the passion, charisma, and most importantly, the leadership skills and strategic vision to take over the TOUGHLOVE® Program and organization.

In 2000, Dr. Zod was elected to the board of directors of TOUGHLOVE® International, Inc., the not-for-profit organization that administered the TOUGHLOVE® groups and members. He quickly ascended, and within six months was elected as the organization's President. Unfortunately, Dr. Zod continually faced a board of directors that was content operating as an unsophisticated "mom & pop" non-profit organization. Dr. Zod realized the potential in the brand name, program, and vast network that the organization built throughout the years. He further identified the potential to update and expand the TOUGHLOVE® program to include prevention for parenting as well as other areas of behavior modification from marriage & relationship conflict resolution to business management. *It was apparent that a revitalized membership and program was necessary for the TOUGHLOVE® organization to expand, grow and prosper.* Dr. Zod understood that in order to initiate his strategic vision, he would need additional funding, and a new formal management approach. He therefore set out to change the organizational structure from a non-profit, to a private, for-profit business enterprise. Dr. Zod proposed to the Yorks that he would create a new for-profit business venture with newly updated and expanded programs that leveraged the TOUGHLOVE® brand.

Now in the launching mode, the new Company, TOUGHLOVE® America, LLC, will build on the existing brand awareness, existing infrastructure, and membership base. *The Company will transform the TOUGHLOVE® organization from a poorly managed non-profit organization into a dynamic for-profit global educational services and media company.* The Company will first launch in North America, where it currently has its largest concentration of existing members. Within approximately twelve months after launch, the Company will begin to capitalize on the popularity of its program and existing infrastructure overseas and expand operations throughout Europe, South America, Australia, New Zealand and the Far East. Adhering to Dr. Zod's original long-term vision for TOUGHLOVE®, *the Company will become one of the leading global educational services and media organizations in the self-help industry.* The Company's new business development efforts are focused on three main strategic thrusts, which overlap in sequence and execution.

*The first step of action is to install a structured, professional management team to oversee the development, expansion and marketing of the Company.* This venture team will focus on strengthening the existing base by reinvigorating the community infrastructure already in place.

*The second step will focus on creating new products and services based on the TOUGHLOVE® product platform and viable brand name. These new products will include books, workbooks and several series of video and audio tapes.* These products will be sold to the existing members as well as the general public throughout the world via an array of marketing and distribution channels. These channels include retail, direct response (infomercial, etc.), internet-based marketing, and radio. The Company will also develop substantial "grass-roots" efforts that will include coordination throughout the nation's public and private school systems. These efforts will reach the hearts of small and large communities.

The third step will include a publicity campaign. *This campaign will clearly establish the Company's foothold as the segment leader, as well as solidify Dr Zod's position as the number one credentialed authority in the area of parenting and child, family and relationship therapy.* This campaign will include appearances on major talk shows on television, cable, and radio. Dr. Zod will also write a series of informative columns and articles for

distribution in national and regional newspapers and magazines.

The Company has entered into a strategic partnership with McGraw-Hill to publish *the first in a series of new TOUGHLOVE® books authored by Dr. Zod.* Upon publication, and in coordination with McGraw-Hill, a $16 billion global publishing company, *Dr. Zod will commence a domestic and global book tour to promote the initial book on parenting.* These promotional efforts will further promote the Company's support groups, products and parenting programs. *The Company will also work with McGraw-Hill to produce and promote a series of seminars that will help publicize the book as well as the Company's new TOUGHLOVE® parenting programs.* In addition, as the global leader in textbook publishing, the strategic partnership with McGraw-Hill provides the Company's portfolio of new products and new programs further acceptance, credibility and relationships throughout the world of professional education. *All of the Company's vast marketing and publicity efforts will be supported with a state of the art, informative and interactive Web site.*

*See* PPM at pps. 57-58 (emphasis supplied).

93.    It is submitted that the following statements of material fact contained in the

above quote were false and misleading as of the Investment Date:

a.    "It was apparent that a revitalized membership and program was necessary

for the TOUGHLOVE® organization to expand, grow and prosper" – this

statement was misleading because, among other things, the defendants never

made any efforts to revitalize the TLA membership or to update the TLA

programs;

b.    "The Company will transform the TOUGHLOVE® organization from a

poorly managed non-profit organization into a dynamic for-profit global

educational services and media company" – this statement was misleading

because, among other things, the defendants never properly managed TLA;

22

c.      "the Company will become one of the leading global educational services and media organizations in the self-help  industry" – this statement was misleading and/or reckless;

d.      "The first step of action is to install a structured, professional management team to oversee the development, expansion and marketing of the Company" – this statement was misleading because, among other things, the defendants never installed, and never intended to install, a professional management team;

e.      "The second step will focus on creating new products and services based on the TOUGHLOVE® product platform and viable brand name. These new products will include books, workbooks and several series of video and audio tapes" – this statement was misleading because, among other things, the defendants never created new products or services for TLA;

f.      "This campaign will clearly establish the Company's foothold as the segment leader, as well as solidify Dr Zod's position as the number one credentialed authority in the area of parenting and child, family and relationship therapy" – this statement was misleading because, among other things, the defendants never undertook such a campaign.

g.      "the first in a series of new TOUGHLOVE® books authored by Dr. Zod" – this statement was misleading because, among other things, the defendants never generated any additional books.

h.    "Dr. Zod will commence a domestic and global book tour to promote the initial book on parenting" – this statement was misleading because, among other things, the dispute among the Individual Defendants.

i.    "The Company will also work with McGraw-Hill to produce and promote a series of seminars that will help publicize the book as well as the Company's new TOUGHLOVE® parenting programs" – this statement was misleading because, among other things, it never happened.

j.    "All of the Company's vast marketing and publicity efforts will be supported with a state of the art, informative and interactive Web site" – this statement was misleading because, among other things, the dispute among the Individual Defendants.

94.    The PPM contained many misrepresentations concering Zodkevicth and his credentials and qualifications to lead and be the face of TLA, as well as Zodkevitch's ability and efforts toward creating new programs or additional media materials for TLA.

95.    It is submitted, further, that the PPM mispresented Zodkevitch's efforts and capability to develop and enhance the programs including in the TOUGHLOVE® IP.

96.    It is also asserted that the defendants omitted to disclose Zodkevitich's alternative lifestyle, which upon information and belief would have had a negative effect on the business of TLA.

97.    Prior to the Investment Date, the defendants made the following misrepresentations to plaintiffs, relating to Zodkevitch's qualifications:

a.    that Zodkevitch was a "psychiatrist to the stars" – a private practice

24

psychiatrist treating celebrities, sports stars, and entertainment industry
executives;

      b.      a proven media personality who had founded the "Loveline" radio and
television shows;

      c.      an experienced entrepreneur who had already successfully founded and
financed other businesses;

      d.      a well-connected and well-respected member of the behavioral sciences
community with access to health insurance and hospital executives whom he
could contact for the furtherance of TLA's business;

      e.      an appropriate and qualified spokesman for TLA – a family values
organization and recognized mark – and that he would be a valuable and
experienced member of the business; and

      f.      involved in a "celebrity" relationship with Mary McDonough of the *The
Waltons* TV show, and that Ms. McDonough was pressuring Zodkevitch to get
married.

98.      Prior to the Investment Date, the defendants mispresented Zodkevitch's
experience, contacts, and involvement with the TOUGHLOVE® programs as follows:

      a.      that Zodkevitch was the creator of a detailed and updated program for
TOUGHLOVE®, which he described as "TOUGHLOVE® for an 'R-rated'
world" which he would utilize to expand the existing TOUGHLOVE® programs,
to a new leadership base, membership, and media; and

      b.      that Zodkevitch was well-connected to the TOUGHLOVE® groups and

program-leaders and would be able to utilize these connections as a captive

audience for proposed TOUGHLOVE® clinical centers.

99.    The Individual Defendants knew or should have known that the resentations made

to plaintiffs concerning Zodkevitch were false and that plaintiffs would rely upon them.

100.    Upon information and belief the Individual Defendants made these representations

in furtherance of their conspiracy to raise money for TLA and to induce plaintiffs to invest

money in TLA.

101.    Plaintiffs had no reason to doubt the truthfulness of the defendants'

representations concerning Zodkevitch.

102.    Plaintiffs relied on the defendants representations concerning Zodkevitch in

making their decision to invest in TLA.

103.    With respect to Feibush the PPM states, further, that:

> Igal J. Feibush is a co-founder and Chief Executive Officer of the
> Company. He is the original founder and CEO of Citi Habitats
> America Corp., one of the leading real estate brokerage companies
> in New York City. As a successful serial entrepreneur, once
> nominated by Crains New York as one of the top 40 entrepreneurs
> under 40 years of age in the City of New York, he brings expertise
> in business development, formal management practices, and profit
> & loss accountability. Mr. Feibush and Dr. Zodkevitch have
> known each other from their early childhood days in New York
> City. The two reconnected in 2001 at a time when Dr. Zodkevitch
> was seeking an experienced entrepreneur to help lead the new
> TOUGHLOVE America business venture.

*See* PPM at p. 50.

104.    It is submitted that the PPM mispresented many material facts concering Feibush

and his credentials and qualifications to manage the business of TLA.

105.    It is submitted, further, that the PPM omitted to disclose Feibush's dispute with

26

Zodkevitch.

106.    With respect to Spiegel the PPM states, further, that:

> Steven J. Spiegel, Esq., also a co-founder, currently serves as
> Executive VP and General Counsel to the Company. He is a
> Managing Partner of Spiegel & Jones, LLP, a New York-based law
> firm that dates its roots to 1995. Mr. Spiegel concentrates his legal
> practice in mergers, acquisitions, private ventures, commercial
> financing, and intellectual property, especially "branding"
> transactions. He is an honors graduate of Brown University, a
> Harlan Fiske Stone Scholar from Columbia University Law
> School, and, until 1991, was associated for more than 5 years with
> Skadden Arps Slate Meagher & Flom in New York and Los
> Angeles.

*See* PPM at p. 50.

107.    It is submitted that the PPM mispresented many material facts concering Spiegel,

including but not limited to his credentials and qualifications to advise and/or manage TLA, the

extent of TLA's indebtedness to Spiegel and Spiegel and the Attorney Defendants conflicts of

interest.

108.    It is submitted, further, that the PPM omitted to disclose Speigel's dispute with

Zodkevitch.

109.    With respect to the use of proceeds the PPM stated that:

**Estimated Use and Budgets**

> The net proceeds of this Offering will be used to fund the cash flow budget
> of the Company, a  summary of which is attached as Exhibit "A" of this
> Memorandum. To the extent practicable, the  Company will use funds
> raised in this Offering and funds generated internally in accordance with
> this detailed cash flow budget.

> Investors desiring to review the detailed cash flow budget may do so by
> contacting the Company,  as provided in Exhibit "A". This detailed cash
> flow budget has not been attached for purposes of  (i) confidentiality, as it
> represents a detailed view of the month-by-month strategic plan of the

27

Company, and (ii) convenience, as it is not easily printable, since this detailed cash flow budget was prepared using Microsoft Excel, and spans hundreds of rows over dozens of columns, projecting income and expenses, cash flows and earnings, through the end of 2009.

Like all budgets and projections of future events, the actual use of proceeds may depend on future events. Management has made certain assumptions about these future events in this detailed cash flow budget, and the actual uses of the proceeds of this Offering will change based on Management's adaptability, agility and alertness with respect to these future events, as, if and when they actually occur.

*In reacting to changing events, Management will continue to be guided by the basic objectives of the Company's business plan in using the proceeds of this Offering, as well as funds generated internally. These basic objectives are:*

*(1) Build the network of TOUGHLOVE® education and support groups, (2) Create new media products and new content, for the membership and target markets, including interactive content via toughlove.com, and (3) Publicize and market the TOUGHLOVE® program.*

The Offering contains minimum and maximum amounts, to provide for contingency, working capital and special media projects, which are dependent in part on internally generated cash flows. As summarized in the business plan, should Management elect to pursue the Maximum Offering of $4,000,000 (which Management is not required to do), and should Management be successful in raising this Maximum Offering, the projected breakdown of the use of proceeds will be as follows:

| Use of Proceeds | Amount | % of total |
|---|---|---|
| Membership Activities | $80,000 | 2.00% |
| Media Activities (incl. membership video curriculum) | $1,435,000 | 37% |
| Marketing/Public Relations | $300,000 | 7.50% |
| Executive Management Fees | $400,000 | 10% |
| Corporate Infrastructure | $600,000 | 15% |
| Working Capital | $435,000 | 11.00% |

28

| | | |
|---|---|---|
| Financing Fees & Costs | $500,000 | 12.50% |
| Other Expenses | $200,000 | 5% |
| Total Capital Requirements | $4,000,000 | 100% |

These breakdowns are further explained as follows, per Section IX ("Financing Strategy") of the business plan contained in this Memorandum:

• Membership Activities. These disbursements include producing monthly workshops, seminars, annual conferences, and include commissions paid out to group leaders and representatives.

• Media Activities. These disbursements include video production, infomercial production, media buying costs, and video inventory. There is overlap with membership activities, as this includes the membership video curriculum.

• Executive Management Fees. The fulltime executives include Dr. Zodkevitch as the Program Director, and Mr. Feibush as CEO. Mr. Spiegel will be engaged as a part-time general counsel. A CFO will be hired in the first quarter 2006, and a COO will be hired in summer 2006.

• Marketing/Public Relations. These disbursements include the fees paid to an outside public relations agency, and for the Company's publicity materials.

• Corporate Infrastructure. The Company's executive offices will be located in Southern California, preferably near the Westside of Los Angeles. Upon opening its doors, the Company will hire a fulltime Chief Financial Officer, a fulltime Corporate communications Director, and one executive assistant.

By the first quarter of 2006 the Company will hire three Program Trainers to train and develop new representatives.

• Other Expenses. The Company will engage intellectual property (IP) experts to protect its brand name and other IP around the world. The Company will also pay licensing fees to the Yorks.

Management may adjust these uses and the allocation of proceeds with

respect to these uses, in  accordance with the Operating Agreement and
this Memorandum.

The allocation of proceeds, as set forth above, will be adjusted in the event
that Management  elects, in its discretion, to sell less than the Maximum
Offering of $4,000,000 in Investor  Membership Interests. In such event,
the above allocation of proceeds may not necessarily be  reduced
proportionately to the actual amount of the Offering. For example,
Management notes  the category for "working capital" which might likely
be reduced, based on the adequacy of  internally generated cash flows in
lieu of equity financing; other categories would similarly be  reduced
based on such internally generated cash flows, the timing of certain
projects, etc.

A portion of the gross proceeds will also be used to pay the transaction
costs of this Offering.  These transaction costs may include the costs of
finder's fees or commissions, printing costs,  reasonable travel and
entertainment expenses, bank fees, and legal fees. These transaction costs
are not fixed, and may vary based on the number of Prospective Investors
and their inquiries, and  the eventual size of the Offering.

*See* PPM at p. 15-16 (emphasis supplied).

110.    It is submitted that many statements of material fact contained in the above quote

were false and misleading as of the Investment Date, because, among other things:

a.    The defendants did not use the proceeds of the PPM Offering to: (i)

build the network of TOUGHLOVE® education and support groups,

(ii) create new media products and new content, for the membership and

target markets, including interactive content via toughlove.com, and

(iii) publicize and market the TOUGHLOVE® program;

b.    The Use of Proceeds section is false and misleading because TLA

only raised $747,500 in the PPM Offering and not $4,000,000; and

c.    TLA did not use the proceeds of the PPM Offering in accordance with the

disclosures contained in the PPM.

30

111.    Section IX of the PPM provided:

## IX. Financing Strategy

The Company is seeking equity investment, from qualified investors through this Confidential Private Placement Memorandum, to finance its new product development and expansion strategy. As a part of its financing strategy, the Company is currently offering approximately 29.63% in equity for the investors that can complete the total financing needs of $4,000,000. This places the Company's value at about $10 million pre-money. *The Company reaches "EBITDA $1.00" in January 2007, subsequently ramping-up to just over $22,000,000 for the year 2007 in total.*

*The Company's uses of proceeds are intended to accelerate the TOUGHLOVE® program at full throttle, financing its national re-expansion.* Included in this use of proceeds is working capital for infomercial production, media buying and for putting the plan to action through its community of members. The Company will focus on getting key branded executives. This means completing out the Company's venture team and completing the transition from entrepreneurial management practices to professional management practices. This will ultimately shift the fulcrum from development to execution.

### Cash Budget Table Quickview

|  | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Total Receipts | $0 | $1,696,695 | $46,623,378 | $130,957,653 | $234,006,112 |
| Less Disbursements | $68,000 | $3,943,189 | $24,076,846 | $ 55,707,231 | $ 95,687,115 |
| EBITDA | ($68,000) | ($2,246,494) | $22,546,532 | $ 72,453,422 | $138,318,997 |
| Financing |  |  |  |  |  |
| Debt Financing |  |  |  |  |  |
| Equity Financing | $1,500,000 | $2,500,000 |  |  |  |
| Total Financings | $1,500,000 | $2,500,000 |  |  |  |
| Cash Balance | $1,432,000 | $1,685,506 | $24,232,038 | $96,685,460 | $235,004,457 |

| Use of Proceeds | Amount | % of total |
|---|---|---|
| Membership Activities | $80,000 | 2.00% |
| Media Activities (incl. membership video curriculum) | $1,435,000 | 37% |
| Marketing/Public Relations | $300,000 | 7.50% |
| Executive Management Fees | $400,000 | 10% |
| Corporate Infrastructure | $600,000 | 15% |
| Working Capital | $435,000 | 11.00% |

31

| | | |
|---|---|---|
| Financing Fees & Costs | $500,000 | 12.50% |
| Other Expenses | $200,000 | 5% |
| | ---------------------- | |
| **Total Capital Requirements** | **$4,000,000** | **100%** |

*See* PPM at p. 53-54 (emphasis supplied).

112.    It is submitted that the projections for TLA set forth in the PPM are materially false and misleading. We note that the projections do not reflect the revenues generated for 2005. We also submit that defendants lacked a reasonable basis for the projections set forth in the PPM.

113.    The description of the use of proceeds of the offering set forth in the PPM was also false and misleading. *See* Exhibit A attached hereto.

114.    Following the Investment Date, the defendants breached their duties owed to the plaintiffs by failing to disclose material facts to the plaintiffs, such as the dispute between Zodkevith, Feibush and Spiegel.

115.    Allegedly, in or about September 2005, the Individual Defendants agreed to reallocate the ownership percentages of AFHS (the "Reallocation Agreement"). As of March 30, 2005, Zodkevitch, Feibush and Spiegel owned the following percentage interests in AFHS, 65%, 30% and 5%, respectively. Based on the alleged Reallocation Agreement, the Individual Defendants agreed to modify the ownership percentages of AFHS so that Zodkevitch, Feibush and Spiegel owned the following percentage interests in AFHS, 43%, 43% and 14%, respectively.

116.    In January 2006 when Feibush and Spiegel requested that Zodkevitch execute documents to give effect to the Reallocation Agreement, Zodkevitch allegedly reneged on the

Reallocation Agreement. This caused a major dispute among the Individual Defendants.

117.    Despite being obligated to do so, not one of the Individual Defendants disclosed the dispute among the Individual Defendants to the plaintiffs, even though plaintiffs' investment money was still held in escrow.

118.    The Attorney Defendants wrongfully released to the plaintiffs' $675,000 from escrow without disclosing the dispute among the Individual Defendants to the plaintiffs.

119.    The Individual Defendants breached their obligations owed to the plaintiffs by permitting the Attorney Defendents to release to the plaintiffs' $675,000 from escrow without disclosing the dispute among the Individual Defendants to the plaintiffs.

120.    It is submitted that Feibush and Spiegel wrongfully paid themselves at least $180,000 out of the proceeds of the TLA offering under the PPM.

121.    Attached hereto as Exhibit B is a schedule prepared by Zodkevitch's counsel in connection with the State Action which delineates the conduct of the Individual Defendants between January 2006 and May 2006. The information contained in Exhibit B is incorporated herein.

122.    In or about May 2006, Zodkevitch, in his individual capacity, commenced an action in New York State Supreme Court, New York County against Feibush and Spiegel seeking to recover damages based on, among other things, claims of fraud, breach of fiduciary duties and malpractice (the "State Action").

123.    In June 2006, Zodkevitch, in connection with the State Action sought and obtained a preliminary injunction against Feibush and Spiegel which effectively closed the business of TLA.

124.    Zodkevitch breached his duties to TLA and the plaintiffs by commencing the State Action and by seeking the preliminary injunction after the defendants took and spent plantiffs money in the PPM Offering.

125.    In July 2006, in response to the State Action, Spiegel, in his individual capacity, filed counterclaims against Zodkevitch for, among other things, legal fees.  Speigel also filed a third party complaint against AFHS and TLA for, among other things, legal fees.  Upon information and belief neither AFHS nor TLA has interposed an answer to Spiegel's third party complaint.

126.    Zodkevitch and Feibush breached their fiduciary duties owed to TLA and the plaintiffs by failing to interpose a defense to Speigel's third party complaint filed in connection with the State Action.

127.    Between the Investment Date and the present date, the defendants have never provided the plaintiffs any financial information concerning TLA.

128.    Based on the foregoing plaintiffs respectfully request a judgment holding the defendants jointly and severally liable for the damages suffered by plaintiffs in an amount to be determined at the trial, but at least $675,000 plus interest.

## PLAINTIFFS' DIRECT CLAIMS

### FIRST DIRECT CLAIM FOR RELIEF
### AGAINST DEFENDANTS SEEKING MONEY DAMAGES
### FOR VIOLATIONS OF SECTION 10(b) OF THE SECURITIES
### EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER

129.    All preceding paragraphs are incorporated by reference as if fully set forth here.

34

130.    Defendants violated Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. Section 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. Section 240.10b-5] (collectively referred to as the "Federal Securities Laws"), in that, through the means and instrumentalities of interstate commerce, and the mails, and the facilities of a national stock exchange, defendants:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, including, inter alia, defendants fraudulent inducement to cause the plaintiffs to invest $675,000 in TLA and upon the representations of the Individual Defendants made in furtherance of the defendants' conspiracy; and

(c) engaged in acts, practices, and a course of business that operated as a fraud against the plaintiffs.

131.    Defendants violated the Federal Securities Laws in connection with the sale of the securities of TLA by knowingly or recklessly:

(a) making material misrepresentations of fact concerning, among other things, the credentials of the Individual Defendants, the debts and financial obligations of TLA, the financial projections of TLA and the collapsing of the license structure of the TLA License; and

(b) failing to disclose material facts the defendants were under a duty to disclose to the plaintiffs at the time the statements were made, such as the dispute among

35

the Individual Defendants.

132.    Prior to the Investment Date, Zodkevitch, Fiebush and Spiegel in furtherance of the defendants' conspiracy made specific mispresentations concerning TLA to the plaintiffs, to induce the plaintiffs to invest $675,000 in TLA, including, but not limited to, the following:

      a.      that Zodkevitch had the credentials and qualifications to manage TLA and be the face of TLA;

      b.      that Feibush had the credentials and qualifications to manage TLA;

      c.      that TLA had accounting controls or that TLA had engaged accountants;

      d.      that TLA had raised more that $1,000,000 under the PPM, not including plaintiffs' investment.

      e.      the business prospects of TLA and the financial projections of TLA;

      f.      the relationship among Zodkevitch, Fiebush and Spiegel, including their dispute over the ownership of AFHS and other conflicts of interest;

      g.      that the license structure relating to the TOUGHLOVE® IP would be collapsed, so that TLA would be the direct holder of the license for the TOUGHLOVE® IP;

      h.      the use of the proceeds raised in the PPM Offering; and

133.    Prior to the Investement Date, Zodkevitch, Fiebush and Spiegel in furtherance of the defendants' conspiracy omitted to disclose to the plaintiffs the following material facts concerning TLA:

      a.      the internal dispute among the Individual Defendants;

      b.      the lack of management experience of the Individual Defendants;

36

    c.    the lack of any accounting controls for TLA;

    d.    the true nature of the debt and liabilities of TLA, including but not limited to TLA's indebtedness to Spiegel and the Attorney Defendants.

    e.    the true use of proceeds from the TLA offering; and

    f.    Zodkevitch's alternative lifestyle.

134.    Plaintiffs relied on the representations Zodkevitch, Fiebush and Spiegel made in furtherance of the defendants' conspiracy in deciding to invest $675,000 in TLA and have been damaged as a direct result of such reliance.

135.    Had plaintiffs known the representations concerning TLA made by Zodkevitch, Fiebush and Spiegel were false the plaintiffs would not have invested $675,000 in TLA.

136.    The plaintiffs justifiably relied on the PPM and on each of the other written or verbal material misrepresentations made by Zodkevitch, Fiebush and Spiegel in furtherance of the defendants' conspiracy. The Individual Defendants' material misrepresentations induced the plaintiffs to invest $675,000 in TLA.

137.    The plaintiffs have suffered damages as a direct and proximate result of the defendants' actions.

138.    Based on the foregoing the defendants have violated the Federal Securities Laws.

139.    Based on the foregoing the plaintiffs respectfully request a judgment against defendants, jointly and severally, for an amount to be determined at trial, but at least $675,000, representing the damages sustained by plaintiffs as the result of the defendants' wrongful conduct in violation of the Federal Securites Laws.

## SECOND DIRECT CLAIM FOR RELIEF AGAINST DEFENDANTS
## SEEKING RESCISSION AND RESTITUTION
## FOR VIOLATIONS OF SECTION 10(b) OF THE SECURITIES
## EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER

140.    All preceding paragraphs are incorporated by reference as if fully set forth here.

141.    Based on the foregoing the defendants have violated the Federal Securities Laws.

142.    Based on the foregoing the plaintiffs respectfully request a judgment rescinding

the plaintiffs' investment of $675,000 in TLA and holding the defendants, jointly and severally,

liable to the plaintiffs for $675,000 plus interest from January 2006.


## THIRD DIRECT CLAIM FOR RELIEF AGAINST DEFENDANTS
## FOR COMMON LAW FRAUD (FRAUDULENT INDUCMENT)

143.    All preceding paragraphs are incorporated by reference as if fully set forth here.

144.    Defendants knowingly, fraudulently, and with the intent to deceive the plaintiff,

misrepresented material facts to the plaintiffs to fraudulently induce the plaintiffs to invest

$675,000 in TLA.

145.    Defendants knowingly, fraudulently, and with the intent to deceive the plaintiff,

failed to disclose material facts the defendants were under a duty to disclose to the

plaintiffs at the time the statements were made.

146.    Defendants conduct has operated as a fraud upon the plaintiffs and the

plaintiffs have suffered damages.

147.    Defendants fraudulently induced the plaintiffs to invest $675,000 in TLA.

148.    Defendants misrepresented material facts or omitted to disclose material facts to

the plaintiffs in connection with the plaintiffs' investment of $675,000 in TLA.

38

149.    In making said misrepresentations, the defendants misstated and omitted to state facts material and necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

150.    At the time of the misrepresentations the plaintiffs was unaware of their falsity, and believed the defendants' representations to be true.

151.    In reliance on defendants' misrepresentations, and in reliance of the superior knowledge and expertise of the defendants, the plaintiffs were fraudulently induced to and did invest $675,000 in TLA.

152.    Defendants have not return any part of the $675,000 to plaintiffs.

153.    Defendants were unjustly enriched by fraudulently inducing plaintiffs to invest $675,000 in TLA.

154.    Based on the foregoing the plaintiffs respectfully request a judgment against defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, but at least $675,000, representing the damages sustained by plaintiffs as the result of the defendants' wrongful conduct.

155.    Plaintiffs also ask for interest on the compensatory damages from January, 2006 plus reimbursement of all costs and expenses (including reasonable attorenys' fees) incurred in connection with this action.

156.    By virtue of the defendants' intentional wanton and reckless conduct, the plaintiffs ask for a judgment of punitive damages against the defendants in an amount to be determined by the Court.

39

## FOURTH DIRECT CLAIM FOR RELIEF AGAINST
## DEFENDANTS FOR INTENTIONAL MISREPRESENTATION

157.    All preceding paragraphs are incorporated by reference as if fully set forth here.

158.    Defendants misrepresented material facts or omitted to disclose material facts, in furtherance of the  to the plaintiffs in connection with the plaintiffs' investment of $675,000 in TLA.

159.    In making said misrepresentations, the defendants misstated and omitted to state facts material and necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

160.    At the time of the misrepresentations the plaintiffs were unaware of their falsity, and believed the defendants' representations to be true.

161.    In reliance on defendants' misrepresentations, and in reliance of the superior knowledge and expertise of the defendants, the plaintiffs were fraudulently induced to and did invest $675,000 in TLA.

162.    Had the plaintiffs known the truth, the plaintiffs would not have invested $675,000 in TLA.

163.    Based on the foregoing the plaintiffs respectfully request a judgment holding the defendants, jointly and severally, liable for compensatory damages in an amount to be determined at trial, but at least $675,000, representing the damages sustained by plaintiffs as the result of the defendants' wrongful conduct.

164.    Plaintiffs also ask for interest on the compensatory damages from January, 2006 plus reimbursement of all costs and expenses (including reasonable attorenys' fees)  incurred in connection with this action.

40

165.    By virtue of the defendants intentional, wanton and reckless conduct, the

plaintiffs also ask for a judgment of punitive damages against the defendants in an amount to be

determined by the Court for the intentional, wanton and reckless conduct of the defendants.

**FIFTH CLAIM FOR RELIEF AGAINST THE INDIVIDUAL DEFENDANTS
AND AFHS FOR BREACH OF FIDUCIARY DUTY AND BREACH OF CONTRACT**

166.    All preceding paragraphs are incorporated by reference as if fully set forth here.

167.    The AFHS is a signatory to the TLA Operating Agreement, AFHS owns over 90%

of TLA and the Individual Defendants are the control persons of TLA.

168.    The Individual Defenants control the business and the affairs of TLA.

169.    As a signatory to the TLA Operating Agreement, managing member, and majority

interest-holder in TLA, AFHS and the Individual Defendants owed a contractual duty to protect

the TOUGHLOVE® IP as well as to act in accordance with their responsibilities and the best

interests of TLA.

170.    The defendants also owed a duty of good faith and fair dealing in carrying out

their responsibilities under the TLA Operating Agreement.

171.    The Individual Defendants by acting in their own self interest to the detriment of

plaintiffs have breached their duty of good faith and fair dealing and have breached the TLA

Operating Agreement and plaintiffs have been damaged thereby.

172.    Defendants have abdicated their responsibilities and/or failed to properly and

adequately perform their responsibilities under the TLA Operating Agreement, and have thereby

destroyed and/or caused the destruction of the TLA's business and the loss of the TLA License.

41

173. The Individual Defendants and AFHS have breached their contractual obligations to plaintiffs under the TLA Operating Agreement and plaintiffs have been damaged thereby.

174. Based on the foregoing the plaintiffs respectfully requests a judgment holding the Individual Defendants and AFHS, jointly and severally, liable to plaintiffs in an amount to be determined at trial.

## SIXTH DIRECT CLAIM FOR RELIEF
## AGAINST DEFENDANTS FOR UNJUST ENRICHMENT

175. All preceding paragraphs are incorporated by reference as if fully set forth here.

176. By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of plaintiffs.

177. Plaintiffs seek restitution from the defendants and an order of this Court directing the defendants to disgorge all profits, benefits, and other compensation obtained by defendants, and each of them, from their wrongful conduct and fiduciary breaches.

178. Based on the foregoing the plaintiffs respectfully requests a judgment holding the defendants, jointly and severally, liable in an amount to be determined at trial.

## PLAINTIFFS' DERIVATIVE CLAIMS

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

179. All preceding paragraphs are incorporated by reference as if fully set forth here.

180. Plaintiff brings this action derivatively in the right and for the benefit of TLA to redress injuries suffered, and to be suffered, by TLA, as a direct result of the breaches of fiduciary duty, mismanagement, waste of corporate assets, negligence and legal malpractice by the Individual Defendants and Attorney Defendants. This is not a collusive action to confer

42

jurisdiction on this Court that it would not otherwise have.

181.    Plaintiffs will adequately and fairly represent the interests of TLA in enforcing and prosecuting its rights.

182.    Plaintiffs are the owners of membership interests in TLA representing an aggregate ownership percentage of 5% of TLA during times relevant to the wrongful conduct alleged herein, and they remain members of TLA.

183.    During all relevant times AFHS was the manager of TLA and the Individual Defendants are all owners and control persons of AFHS.  Plaintiffs have not made any demand on TLA or the Indidvidual Defendants to institute this action because such a demand would be futile, wasteful, and useless. Demand would be futile for the following reasons:

   a.    Based on the conflicts stated herein the Individual Defendants each are legally incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

   b.    The management of TLA is deadlocked and the Individual Defendants have multiple conflicts of interest and entangling business relationships that preclude them from being disinterested and likely to vigorously prosecute the wrongdoing alleged in this complaint, including but not limted to the dispute between the Individual Defendants over the ownership interests in AFHS and the claims and issues asserted in the State Action.

   c.    TLA's managers are not disinterested or independent and served as managers of TLA during the time of the wrongdoing and participated in the wrongs complained of here. Pursuant to their specific duties as managers of TLA each

43

was charged with the management of TLA and its business affairs. Each breached the fiduciary duties that they owed to TLA and its members in that they failed to prevent and correct the improper financial statements and properly supervise TLA's operations.

d.    Each of the Individual Defendants knew or directly benefitted from the wrongdoing alleged in this complaint;

e.    The Individual Defendants participated in efforts to conceal or disguise these wrongs from TLA's members or recklessly or negligently disregarded the wrongs alleged in this complaint and are, therefore, not disinterested parties;

f.    In order to bring this suit, all of the Individual Defendnats would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thus excusing demand;

g.    The acts alleged in this complaint constitute violations of the fiduciary duties owed by the Individual Defendants, who each exercised conrol over TLA and AFHS, and these acts are incapable of ratification;

h.    Each of the Individual Directors are principal beneficiaries of the wrongdoing alleged here, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

184.    The Individual Defendants have failed and refused to seek to recover for TLA for any of the wrongdoing alleged by plaintiffs even though the Individual Defendants know of the claims and causes of action raised in this complaint.

44

185.    Plaintiffs demand on TLA to bring an action based on the derivative claims and causes of action raised in this complaint would not likely succeed.  Accordingly, plaintiffs are excused from making a pre-suit demand on TLA.


## FIRST DERIVATIVE CLAIM FOR RELIEF
## AGAINST THE INDIVIDUAL DEFENDANTS FOR MISMANAGEMENT

186.    All preceding paragraphs are incorporated by reference as if fully set forth here.

187.    By their actions alleged above, the Individual Defendants have abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of TLA in a manner consistent with the terms of the PPM.

188.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, TLA has sustained significant damages, including, but not limited to, damages associated with TLA's loss of revenues, loss of the TLA License, loss of credibility in the market and the destruction of TLA's business.

189.    As a result of the misconduct and breaches of duty, the Individual Defendants are liable to TLA for damages based on their mismanagement of the business of TLA in an amount to be determined at trial.

190.    Plaintiffs on behalf of TLA have no adequate remedy at law.


## SECOND DERIVATIVE CLAIM FOR RELIEF AGAINST
## THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

191.    All preceding paragraphs are incorporated by reference as if fully set forth here.

192.    As a result of their improper actions, and by failing to properly consider the interests of TLA and its members by failing to conduct proper supervision, defendants have

45

caused TLA to waste valuable corporate assets such as the TLA License.

193.    The Individual Defendants also improperly spend the proceeds of the PPM Offering.

194.    As a result of the waste of corporate assets, the Individual Defendants are liable to TLA.

195.    As a result of the misconduct and breaches of duty, the Individual Defendants are liable to TLA for damages based on the waste of TLA's assets in an amount to be determined at trial.

196.    Plaintiffs on behalf of TLA have no adequate remedy at law.

## THIRD DERIVATIVE CLAIM FOR RELIEF AGAINST
## THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

197.    All preceding paragraphs are incorporated by reference as if fully set forth here.

198.    As alleged in detail above, each of the Individual Defendants had a duty to TLA and its members to, among other things, ensure that TLA was operated in a diligent, honest and prudent manner, and establish and maintain adequate internal financial and operational controls for TLA.

199.    The Individual Defendants did not establish and maintain adequate internal financial and operational controls for TLA and did not make a good faith effort to do so.

200.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, TLA has suffered damages, including, but not limited to, damages associated with TLA's loss of revenues, loss of the TLA License, loss of credibility in the market and the

46

destruction of TLA's business.

201.    As a result of the misconduct alleged here, the Individual Defendants are liable to TLA.

202.    Plaintiffs on behalf of TLA have no adequate remedy at law.

## FORTH DERIVATIVE CLAIM FOR RELIEF
## AGAINST THE ATTORNEY DEFENDANTS FOR NEGLIGENCE

203.    All preceding paragraphs are incorporated by reference as if fully set forth here.

204.    It is submitted that the Attorney Defendants were negligent and/or reckless in representing TLA by failing to disclose material information to the members of TLA, such as the dispute among the Individual Defendants.

205.    It is submitted that the Attorney Defendants were negligent and/or reckless in representing TLA by breaking escrow under the PPM Offering without disclosing material information to the members of TLA, such as the dispute among the Individual Defendants.

206.    It is submitted that the Attorney Defendants were negligent and/or reckless in representing TLA by assisting the Yorks in terminating the TLA License which was the primary asset of TLA.

207.    It is submitted that the Attorney Defendants were negligent and/or reckless in representing TLA by failing to disclose the Attorney Defendants conflicts of interest, including but not limited to TLA's significant indebtedness to the Attorney Defendants and the Attorney Defendants alleged representation of Zodkevitch.

208.    The Attorney Defendants were negligent in not informing the members of TLA of the dispute raging between the Individual Defendants.

4 7

209.    The Attorney Defendants's negligence was the proximate cause of the loss and damage sustained by plaintiffs. But, for the Attorney Defendants negligence, the plaintiffs would not have been invested in TLA and the business of TLA would not have been destroyed.

210.    The Attorney Defendants failed to exercise the degree of care, skill and diligence commonly possessed by members of the legal profession in performing services for TLA.

211.    Based on the Attorney Defendants' negligence described above, plaintiffs have been damaged in an amount to be determined at trial.

212.    Based on the foregoing the plaintiffs respectfully request a judgment holding the Attorney Defendants, jointly and severally, liable to TLA for negligence in an amount to be determined at trial.

213.    Plaintiffs on behalf of TLA have no adequate remedy at law.

## FIFTH DERIVATIVE CLAIM FOR RELIEF AGAINST THE ATTORNEY DEFENDANTS FOR LEGAL MALPRACTICE

214.    All preceding paragraphs are incorporated by reference as if fully set forth here.

215.    It is submitted that the Attorney Defendants were negligent and/or reckless in representing TLA by failing to disclose material information to the members of TLA, such as the dispute among the Individual Defendants.

216.    It is submitted that the Attorney Defendants were negligent and/or reckless in representing TLA by breaking escrow under the PPM Offering without disclosing material information to the members of TLA, such as the dispute among the Individual Defendants.

217.    It is submitted that the Attorney Defendants were negligent and/or reckless in representing TLA by assisting the Yorks in terminating the TLA License which was the primary asset of TLA.

48

218.    It is submitted that the Attorney Defendants were negligent and/or reckless in representing TLA by failing to disclose the Attorney Defendants conflicts of interest, including but not limited to TLA's significant indebtedness to the Attorney Defendants and the Attorney Defendants alleged representation of Zodkevitch.

219.    The Attorney Defendants commited legal malpractice by not informed the members of TLA of the dispute raging between the Individual Defendants.

220.    The Attorney Defendants's legal malpractice was the proximate cause of the loss and damage sustained by plaintiffs, but, for the Attorney Defendants negligence, the plaintiffs would not have been invested in TLA and the business of TLA would not have been destroyed.

221.    The Attorney Defendants failed to exercise the degree of care, skill and diligence commonly possessed by members of the legal profession.

222.    Based on the Attorney Defendants' legal malpractice described above, plaintiffs have been damaged in an amount to be determined at trial.

223.    Based on the foregoing the plaintiffs respectfully request a judgment holding the Attorney Defendants, jointly and severally, liable to TLA for legal malpractice in an amount to be determined at trial.

224.    Plaintiffs on behalf of TLA have no adequate remedy at law.

**WHEREFORE,** Plaintiffs pray for a judgment against the defendants holding the defendants jointly and severally liable:

I.    On the First Direct Claim for Relief: damages in an amount to be determined at  trial, but at least $675,000, plus interest from January, 2006;

49

II.    On the Second Direct Claim of Relief: rescission of the plaintiffs investment in TLA and damages in an amount to be determined at trial, but at least $675,000, plus interest from January, 2006;

III.    On the Third Direct Claim for Relief: damages in an amount to be determined at trial, but at least $675,000, plus expenses and punitive damages as determined by the Court;

IV.    On the Fourth Direct Claim for Relief: damages in an amount to be determined at trial, but at least $675,000, plus expenses and punitive damages as determined by the Court;

V.    On the Fifth Direct Claim for Relief: damages in an amount to be determined at trial, but at least $675,000, plus expenses and punitive damages as determined by the Court;

VI.    On the Sixth Direct Claim for Relief: damages in an amount to be determined at trial, but at least $675,000, plus disgorgement of any payments, gain or compensation paid to the defendants;

VII.    On the First Derivative Claim for Relief: damages in an amount to be determined at trial, but at least $675,000;

VIII.    On the Second Derivative Claim of Relief: rescission of the plaintiffs investment in TLA and damages in an amount to be determined at trial, but at least $675,000;

IX.    On the Third Derivative Claim for Relief: damages in an amount to be determined at trial, but at least $675,000, plus punitive damages as determined by the Court;

X.    On the Fourth Derivative Claim for Relief: damages in an amount to be determined at trial, but at least $675,000, plus punitive damages as determined by the Court;

XI.    On the Fifth Derivative Claim for Relief: damages in an amount to be determined at trial, but at least $675,000, plus punitive damages as determined by the Court; and

XII.    Plaintiffs' costs and expenses incurred in connection with this action, including attorney's fees, and for such other relief as the Court deems appropriate.


## JURY DEMAND

The plaintiffs respectfully demand a trial by jury.


Dated: Commack, New York
       January 25, 2008


                        THE LAW OFFICES OF
                        JAMES A. PRESTIANO, P.C.



                        JAMES A. PRESTIANO, ESQ. (JP-6699)
                        Attorney for Plaintiffs
                        631 Commack Road, Suite 2A
                        Commack, New York 11725
                        (631) 499-6000

51

# EXHIBIT A

EXHIBIT D

## Known Disbursements from TLA Private Placement Proceeds
## February-May 2006

Proceeds Raised:                        $ 747,500
Proceeds Disbursed:                     $ 363,473 (49% of proceeds raised)
Proceeds Disbursed to Defendants:       $ 262,128 (74% of proceeds disbursed)

| Recipient | Amount | Notes |
|---|---|---|
| Feibush | $ 105,493 | Includes $78,000 in salary at the rate of $12,000 per month, plus $27,493 in expenses, including payment of Feibush's personal credit card bills. |
| Spiegel | $ 75,000 | Transferred by Spiegel directly from his IOLA account to his law firm. |
| Lifschultz | $ 33,635 | Includes $31,250 characterized as salary, plus $2,385 in expenses (for which no backup has ever been produced), all in addition to the 5% equity grant. |
| Yorks | $ 48,000 | All paid as license fees, including fees paid "in advance," through August 2006, for licensing their marks to "TOUGHLOVE® Management, LLC" (95% owned by Feibush and 5% owned by the Yorks themselves). |
| Gosfield | $ 5,750 | Paid by Spiegel from the TLA funds in his IOLA account, one week after Gosfield sent the Notice purportedly terminating the original license on which AFHSG and TLA depended for their rights to use the Toughlove® marks. |
| **TOTAL** | $ 262,128 | |

## Additional Disbursements Discovered After Preliminary Injunction Hearing:

May 2006 Disbursements from North Fork Account:        $  9,878[1]
June 2006 Disbursements from North Fork Account:       $  7,154
July 2006 Disbursements from North Fork Account:       $    553
Subsequent Disbursements from North Fork Account:      *unknown*[2]

---

[1] This figure is the difference between the ending balance in April and the beginning balance in June. Feibush has never produced the May North Fork statement.

[2] Feibush has never produced the August or September North Fork statements.

**EXHIBIT B**

EXHIBIT C

## DEFENDANTS' CONDUCT JANUARY-MAY 2006
### (conduct concealed from plaintiffs in *italics*)

| | |
|---|---|
| Jan. 28-29 | Zodkevitch refuses to amend AFHSG Operating Agreement to give Feibush 43% and Spiegel 14%. |
| Jan. 31 | Spiegel emails Zodkevitch: "It is absolutely clear to me that I cannot ethically release any investor monies from escrow until this situation is resolved in writing." |
| Feb. 6 | Spiegel emails Zodkevitch: "FYI, I broke escrow today." Gives no further information. *Spiegel transfers $50,000 to himself and $438,995 to North Fork Bank account under Feibush's control; begins paying himself a $5000/month retainer from remaining TLA funds in his IOLA account.* |
| Feb. 8 | *Feibush begins paying himself $12,000/month from North Fork Bank account.* |
| Feb. 13 | Call (Zodkevitch's counsel) emails Spiegel, demanding "that there be no further disbursements from the proceeds" of the TLA private placement and that an accounting be prepared. *Spiegel forwards demand to Gosfield (Yorks' counsel) and commences strategizing with Gosfield.* |
| Feb. 14 | *Gosfield emails Spiegel: "She [Phyllis York] has said that if Rony moves to litigate she will pull the trademark from him."* |
| Feb. 15 | *Gosfield emails Spiegel, asking that the Yorks be "fronted" the money for Gosfield's fees.* |
| Feb. 16 | *Spiegel emails Gosfield, confirming that TLA will pay the Yorks' legal fees. Gosfield replies: "Excellent. Apparently Phyllis [York] left two excoriating messages on Rony's phone, telling him that if he doesn't stop fighting this issue 'you will be fucked.' Her terms not mine."* |
| Feb. 16 | After speaking with Zodkevitch and Call, Gosfield emails all parties, confirming that Zodkevitch "will not stand in the way, obstruct or challenge the continued sale or offering of the securities at this time. They would like a standstill on disbursements of monies from the accounts . . ." |
| Feb 24 | Parties meet. Yorks pressure Zodkevitch to give up equity to Spiegel and Feibush. Spiegel and Feibush refuse to show business books and records to Zodkevitch unless he waives all legal claims. Thereafter, Zodkevitch repeatedly requests access to financial information; Feibush and Spiegel repeatedly refuse. |
| Feb. 27 | *Spiegel emails Gosfield: "Have some really good ideas about process going forward, looking forward to brainstorming when you get back!"* |
| March 1-7 | *Spiegel's office prepares "Employment, Equity and Confidentiality Agreement" for Lifschultz; contract states that he will receive $6250 per month and a 5% interest in TLA vesting over two years.* |
| March 3 | *Feibush begins paying Lifschultz $6250/month from TLA's funds.* |

| March 4 | *Per Spiegel's timesheet, he reviews and analyzes draft Notice of Termination (of Rony Z License) prepared by Gosfield, discusses it with Gosfield and Feibush.* |
|---|---|
| March 6 | *Spiegel sends draft "Temporary Licensing Agreement" between Yorks and TLA to Gosfield, "as we discussed." Draft recites, inter alia, that "the Yorks have declared RONY Z, LLC in default of the License Agreement, and intend to terminate the License Agreement based on such incurable faults." Gosfield emails Spiegel that she is thinking of sending the Notice of Termination by email, to "accelerate the date of termination (as well as the hysterics).* |
| March 7 | Gosfield sends Notice of Termination to Rony Z . Notice states that Rony Z License will be terminated in 37 days (on April 13). |
| March 8 | Spiegel writes to Call, Zodkevitch and Feibush, stating that he is "in receipt" of the Notice of Termination, advising that, "effective immediately, I am withdrawing from further representation" of AFHGS, and noting that Call had previously requested such withdrawal. |
| March 9 | *Gosfield emails Spiegel, stating, "Igal has made it clear that the initial payments will be $8000 and with additional inflow of money, will go up."* |
| March 10 | *Spiegel sends revised draft "Temporary Licensing Agreement" to Gosfield.* |
| March 13 | *Spiegel pays himself a $5000 retainer for March from TLA's funds.* |
| March 13 | *Yorks sign "Temporary Licensing Agreement" with TLA.* |
| March 14 | *Spiegel pays $5750 to Gosfield from TLA's funds.* |
| March 16 | *Feibush commences paying the Yorks an $8000/month licensing fee, from TLA's funds.* |
| March 21 | Spiegel writes to Bedolis (Zodkevitch's NY counsel), refusing (again) to turn over the books and records of AFHSG or TLA for review – because doing so would "jeopardize the business of TLA and the venture." On next page, Spiegel offers to provide all requested books and records if Zodkevitch first signs a "binding waiver document" promising not to sue. |
| March 31 | Spiegel writes to Zodkevitch and Feibush: "Please be advised that I will be resuming my duties and obligations as General Counsel" of AFHGS. |
| April 13 | Purported termination date of original License between Yorks and Rony Z. |
| April 25 | *Feibush writes to Stick Figure, representing that TLA "owns" the Toughlove® marks.* |
| April 26 | Spiegel writes to Bedolis: "You are hereby advised that, whether you like it or not . . . I remain the general counsel of AFHSG and TLA," and "[m]y fee and equity compensation arrangement remain in effect." |
| May 3 | Todd (Yorks' Philadelphia counsel) writes to Zodkevitch's counsel, refusing request to mediate purported termination of Rony Z License: "There is nothing to mediate. The License is terminated." |

| May 3 | Spiegel writes to Feibush and Bedolis, stating that he is "gravely concerned" by Todd's "alarming" May 3 letter, and does not wish to discuss anything else, "as anything else is moot." Spiegel adds that "[a]t this juncture ALL remaining capital must be preserved for return to TLA's investors," and once again refuses to reveal the business books and records to Zodkevitch. |
|---|---|
| May 5 | Zodkevitch convenes duly noticed Meeting of Members of AFHSG; passes resolution requiring all members to submit financial records to outside CPA for accounting. Feibush and Spiegel boycott meeting, ignore resolution. |
| May 15 | *Yorks and Feibush sign "License Grant and Purchase Option Agreement," under which Yorks would license their marks to "TOUGHLOVE® MANAGEMENT, LLC," to be owned 95% by Feibush and 5% by Yorks. Contract identifies Dr. Zodkevitch as "disreputable person" and requires that he be expelled from TLA.* |
| May 17 | Yorks distribute email, via TLA group email list, to all TLA representatives, coordinators and members: "Please also note that Dr. Rony Zodkevitch is NO LONGER affiliated with Toughlove and is NOT authorized to represent Toughlove in any manner. We will be naming a new program director in the coming weeks." |
| May 19 | Bedolis, on behalf of Zodkevitch, asks Feibush and Spiegel to issue corrective statement to membership. They refuse. |
| May 22 | *Feibush pays the Yorks $24,000, from TLA's funds, as a "prepayment" for June-August license fees under purported contract with "TOUGHLOVE® MANAGEMENT, LLC."* |
| May 25 | Plaintiffs obtain Order to Show Cause re preliminary injunction, returnable on June 14. |
| June 1 | *Spiegel pays himself a $5000 monthly retainer from the TLA funds in his IOLA account.* |

# VERIFICATION

State of New York        )
                         )
County of                )

    BEFORE ME, the undersigned Notary Public, Jeb Brooks personally appeared on January 25, 2008. After being duly sworn by me, he deposed and stated that he is the duly authorized agent for PINEWOOD TRADING CO, L.P. one of the plaintiffs in this action, that he read this Complaint, and the facts stated in the Complaint are true of my own personal knowledge.

    I declare under penalty of perjury that the foregoing is true and correct.

_____
Jeb Brooks

Subscribed and sworn to before me on
January 25, 2008 at New York, New York,
to certify which, witness my hand and
official seal.

_____
Notary Public

JAMES A. PRESTIANO
Notary Public, State of New York
No. 02PR5020581
Qualified in Queens County
Commission Expires Nov. 22, 20 09

52

James A. Prestiano, Esq. (JP-6699)
THE LAW OFFICES OF
JAMES A. PRESTIANO, P.C.
631 Commack Road, Suite 2A
Commack, New York 11725
Tel. No. (631) 499-6000
Fax. No.  (631) 499-6001
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

PINEWOOD TRADING CO, L.P., individually,
JAMES G. BALODIMAS, individually, and
PINEWOOD TRADING CO, L.P. and              _____ CV \_\_\_\_\_
JAMES G. BALODIMAS, derivatively as
Members of TOUGHLOVE AMERICA, LLC,

                    **Plaintiffs,**

      -against-

TOUGHLOVE AMERICA, LLC, AMERICAN
FAMILY HEALTH SERVICES GROUP, LLC,
SPIEGEL & JONES, LLP, SPIEGEL &
ASSOCIATES, LLC, RONY ZODKEVITCH,
IGAL FEIBUSH AND STEVEN SPIEGEL,

                    **Defendants.**

---

# COMPLAINT